******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# IN RE ANNESSA J.*
## (SC 20614)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Kahn, Ecker and Keller, Js.

*Syllabus*

Pursuant to statute (§ 46b-121 (b) (1)), "[i]n juvenile matters, the Superior
Court shall have the authority to make and enforce such orders directed
to parents . . . as the court deems necessary or appropriate to secure
the welfare, protection, proper care and suitable support of a child
subject to the court's jurisdiction or otherwise committed to or in the
custody of the Commissioner of Children and Families."

Pursuant further to this court's decision in *In re Ava W.* (336 Conn. 545),
a trial court has the authority to consider, at the time it determines
whether to terminate a parent's parental rights, the parent's motion for
posttermination visitation with the parent's child or children, and this
authority originates from the trial court's authority to make and enforce
orders pursuant to § 46b-121 (b) (1).

The petitioner, the Commissioner of Children and Families, sought to termi-
nate the respondents' parental rights with respect to their minor child,
A. Because of the COVID-19 pandemic, the trial on the termination
petition was held remotely via Microsoft Teams. During that trial, the
respondents filed motions seeking visitation with A in the event the trial
court terminated their parental rights. At the conclusion of the trial, the
trial court rendered judgment terminating the respondents' parental
rights and denied the respondents' motions for posttermination visita-
tion. In ruling on the respondents' motions, the trial court determined
that the best interest of the child standard was not the correct standard
under § 46b-121 (b) (1) and that posttermination visitation was not
required for A's well-being, welfare, protection, proper care or suitable
support. The respondents appealed to the Appellate Court, which upheld
the trial court's termination of the respondents' parental rights but
reversed the trial court's denial of the respondents' motions for postter-
mination visitation. The Appellate Court concluded that the trial court
had failed to apply the correct standard under § 46b-121 (b) (1) and this
court's holding in *In re Ava W.* when it ruled on the respondents' motions
for posttermination visitation. Specifically, the Appellate Court deter-
mined that this court's decision in *In re Ava W.* did not purport to reject
the best interest of the child standard and that the trial court had
failed to consider whether posttermination visitation was necessary or
appropriate to secure the welfare, protection, proper care and suitable
support of A, taking into account, inter alia, the traditional best interest
analysis. On the granting of certification, the respondent mother
appealed and the petitioner cross appealed to this court. *Held*:

1. The respondent mother's unpreserved state and federal constitutional
   claims relating to the virtual nature of the termination of parental rights
   trial were unavailing, and, accordingly, this court upheld the Appellate
   Court's judgment insofar as it affirmed the trial court's judgment termi-
   nating the respondents' parental rights:

   a. The Appellate Court correctly concluded that the respondent mother
   had failed to establish that she had a fundamental right under article
   first, § 10, and article fifth, § 1, of the Connecticut constitution to an in
   person courtroom trial on the petition to terminate her parental rights:
   the text of those constitutional provisions was silent as to whether trials
   must be conducted in person, our courts have never had occasion to
   interpret either provision as imposing such a requirement, and the respon-
   dent mother did not cite any authority or provide any historical analysis
   to support the proposition that those constitutional provisions require
   an in person trial for the termination of parental rights; moreover, the
   open courts provision of article first, § 10, does not relate to the right
   of physical appearance but was intended to preserve the common-law
   rights of litigants to obtain redress for injuries to their persons, property,
   or reputation, to prohibit the state from imposing unreasonable charges
   on litigants for using the courts, and to end the corrupt practice of

demanding gratuities for the giving or withholding of decisions in pending cases; furthermore, prior case law generally references article fifth, § 1, for the proposition that the legislature is responsible for establishing certain lower courts and defining their jurisdiction, and does not support the proposition that a termination of parental rights trial must be conducted in person, and this court had previously held in *In re Juvenile Appeal (Docket No. 10155)* (187 Conn. 431) that the trial court in that case did not violate the respondent's constitutional rights by conducting a termination of parental rights trial while the respondent participated via telephone instead of in person.

b. The Appellate Court correctly concluded that the record was inadequate to review the respondent mother's unpreserved claim that she was denied the right to physically confront the witnesses against her at the virtual termination of parental rights trial, in violation of the due process clause of the fourteenth amendment to the United States constitution: even if this court agreed with the respondent mother that she had a constitutional right to confront the petitioner's witnesses in person in the absence of a compelling governmental interest sufficient to curtail that right, this court had no factual record or factual findings on which to base a determination of whether that right was violated or whether the trial court had correctly concluded that the government's interests were sufficiently great to warrant conducting the trial virtually; moreover, because the respondent mother objected to the trial being conducted virtually on the basis that doing so would interfere with her ability to present evidence and the trial court's ability to weigh such evidence, the trial court was not alerted to the right to confrontation issue and did not have occasion to make findings of fact regarding the threat posed by the COVID-19 pandemic and whether that threat was sufficiently compelling to curtail any constitutional right to confrontation, and it would be unfair to the petitioner for this court to reach the merits of the respondent mother's claim by assuming that the factual predicates to her claim have been met.

2. The Appellate Court improperly expanded the standard set forth in *In re Ava W.* for deciding motions for posttermination visitation and improperly reversed the trial court's rulings on the respondents' motions for posttermination visitation on the ground that the trial court had failed to comply with that standard: although one sentence in the court's decision in *In re Ava W.* may have suggested that trial courts, in ruling on a motion for posttermination visitation, must decide whether such visitation is in the best interest of the child, the court did not intend that sentence, in isolation, to broaden the applicable standard to include a best interest of the child analysis, and this court read the entire decision in *In re Ava W.* to hold that trial courts must adhere to the necessary or appropriate standard set forth in § 46b-121 (b) (1) rather than the best interest of the child standard when ruling on motions for posttermination visitation; moreover, contrary to the respondent mother's claim that this court must presume that the legislature intended to incorporate the best interest of the child standard into § 46b-121 (b) (1) by virtue of that statute's use of the word "welfare," insofar as the legislature enacted § 46b-121 (b) (1) against the backdrop of common-law history equating the child's welfare with the child's best interest, the legislature frequently has used the term "best interest of the child" and similar terms in statutes that appear in the same chapter as § 46b-121, and, therefore, if the legislature had intended to incorporate the best interest of the child standard into the necessary or appropriate standard set forth in § 46b-121 (b) (1), it would have used the words "best interest of the child" instead of, or in addition to, "welfare"; furthermore, this court concluded that the necessary or appropriate standard is purposefully more stringent than the best interest of the child standard, as, under the former standard, a trial court must find that posttermination visitation is necessary or appropriate, meaning "proper," to secure the child's welfare; in the present case, the Appellate Court incorrectly concluded that the trial court had held the respondents to a more exacting legal standard than the one set forth in *In re Ava W.*, as the trial court's specific references to the standard set forth in *In re Ava W.*, made throughout the relevant portion of its memorandum of decision, and its explicit consideration of at least one factor, enumerated in *In re Ava W.*, that a trial court may consider in determining whether posttermination visitation is necessary or appropriate for the child's well-being, indicated that the trial court applied the correct legal standard in ruling on the respondents'

motions for posttermination visitation, and, because the trial court correctly articulated the necessary or appropriate standard and stated that posttermination visitation was "not required" only after it determined that the respondents had not satisfied their burden of proving that such visitation was necessary or appropriate to secure A's welfare, the trial court understood that it was required to determine whether posttermination visitation was either necessary (i.e., required) or appropriate.

(*Three justices concurring separately in two opinions*)

Argued November 18, 2021—officially released June 20, 2022**

*Procedural History*

Petition by the Commissioner of Children and Families to terminate the respondents' parental rights with respect to their minor child, brought to the Superior Court in the judicial district of Hartford, Juvenile Matters, and tried to the court, *Olear, J.*; judgment terminating the respondents' parental rights and decisions denying the respondents' motions for posttermination visitation; thereafter, the respondents filed separate appeals with the Appellate Court, *Bright, C. J.*, and *Alexander* and *Norcott, Js.*, which affirmed the judgment terminating the respondents' parental rights and reversed the trial court's decisions denying the respondents' motions for posttermination visitation; subsequently, on the granting of certification, the respondent mother appealed and the petitioner cross appealed to this court. *Reversed in part*; *judgment directed.*

*Albert J. Oneto IV*, assigned counsel, for the appellant-cross appellee (respondent mother).

*Evan O'Roark*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, *Clare Kindall*, solicitor general, and *Nisa Khan*, assistant attorney general, for the appellee-cross appellant (petitioner).

*Joshua Michtom*, assistant public defender, for the cross appellee (respondent father).

*Opinion*

McDONALD, J. The Appellate Court reversed the trial court's denial of the respondent parents' motions for posttermination visitation on the ground that the trial court applied an incorrect legal standard when it considered those motions. See *In re Annessa J.*, 206 Conn. App. 572, 575–76, 260 A.3d 1253 (2021). The Appellate Court, however, did affirm the trial court's judgment terminating the respondents' parental rights, rejecting the respondent mother's claims relating to the virtual nature of the termination of parental rights trial. See id., 575. From these determinations, we are presented with a certified appeal and cross appeal.

In her appeal, the respondent mother, Valerie H., claims that the Appellate Court improperly rejected her unpreserved claim that the trial court had violated her rights under article fifth, § 1, and article first, § 10, of the Connecticut constitution by conducting the termination of parental rights trial virtually, via Microsoft Teams,[1] rather than in person. She also claims that the Appellate Court incorrectly determined that the record was inadequate to review her unpreserved claim that she was denied her right to physically confront the witnesses against her at the virtual trial, in violation of the due process clause of the fourteenth amendment to the United States constitution. In the cross appeal, the petitioner, the Commissioner of Children and Families, claims that the Appellate Court improperly expanded the standard for deciding motions for posttermination visitation and improperly reversed the trial court's rulings on those motions for failing to comply with that new standard.[2]

The record and the Appellate Court's decision set forth the pertinent facts and procedural history; see id., 576–80; which we summarize in relevant part. Valerie and the respondent father, Anthony J., first became involved with the Department of Children and Families in 2009, when their daughter, Annessa J., was three years old. The department removed Annessa from the care of her parents because it was concerned about intimate partner violence between the respondents and because they had provided inadequate supervision of Annessa. The trial court subsequently adjudicated Annessa neglected and ordered that she be committed to the care and custody of the petitioner. Thereafter, in 2010, the department reunified Annessa with the respondents. At that time, the respondents also reunited and began living together with Annessa.

In November, 2017, the department received a report alleging that Anthony had sexually abused Annessa and that Valerie had physically neglected her. Valerie recounted that she was unaware of the sexual abuse until July, 2017, when Anthony admitted to her that "he had touched Annessa's genitals over her underpants in

order to teach her a lesson." (Internal quotation marks omitted.) Id., 577. As a result, Valerie asked Anthony to leave the apartment. After the department was informed about the alleged sexual assault, it made efforts to have Valerie place Annessa in therapy. Valerie, however, would not commit to doing so.

Several weeks after leaving Valerie's apartment, Anthony returned and kicked in the door to the apartment, for which he was arrested. Thereafter, one of several protective orders was issued against Anthony, and he subsequently pleaded guilty to numerous charges as a result of this arrest. He received a sentence of one year of incarceration, execution suspended, and two years of probation.

Annessa later reported that Valerie would leave her alone for days at a time, that she would not know where Valerie was during those times, and that the apartment had no heat or electricity. During a forensic interview in December, 2017, Annessa also confirmed that Anthony had "touched her 'bikini area' over her underwear." Id.

Throughout the course of the department's investigation, Valerie refused to cooperate with the department to provide services for Annessa. As a result, in January, 2018, the petitioner filed a petition alleging that Annessa had been neglected. After invoking a ninety-six hour administrative hold on Annessa, the petitioner filed an ex parte motion for an order of temporary custody. The trial court issued the order of temporary custody, and it was thereafter sustained. In July, 2018, Annessa was adjudicated neglected and committed to the custody of the petitioner. Annessa was placed in foster care with the woman who had been Valerie's foster mother years earlier. Annessa has bonded with the foster mother and has expressed a desire to remain in the custody of the foster mother.

The respondents "were given specific steps to facilitate reunification with Annessa, including addressing mental health issues, parenting deficiencies, and intimate partner violence . . . ." Id., 578. Anthony was also ordered to address the sexual abuse of Annessa through counseling. Valerie failed to cooperate with the department throughout its investigation. For his part, Anthony missed several administrative case review appointments but otherwise participated in counseling. He was not, however, initially cooperative about discussing the sexual abuse of Annessa with his therapist.

Given the respondents' lack of progress, in November, 2019, the petitioner filed a petition seeking to terminate their parental rights as to Annessa. Trial on the termination petition was originally scheduled for March, 2020, but was delayed due to the COVID-19 pandemic and the temporary suspension of most trials. In light of the pandemic, a virtual trial was ultimately held in September and October, 2020, via Microsoft

Teams. During the trial, the respondents both filed motions asking that, in the event the trial court terminated their parental rights, the court order visitation to continue with Annessa posttermination.

In its memorandum of decision, the trial court found that the department had made reasonable efforts to reunify each of the respondents with Annessa and that neither parent was able or willing to benefit from reunification efforts. The court also determined that such efforts at reunification were no longer appropriate. In accordance with General Statutes § 17a-112 (j) (3) (B), the court also found that the petitioner had "proven by clear and convincing evidence the 'failure to rehabilitate' ground for termination of the respondents' parental rights." Id., 579. The court also considered the seven statutory factors enumerated in § 17a-112 (k) and concluded that termination of the parental rights of both respondents was in Annessa's best interest.

In its memorandum of decision, the trial court also considered the respondents' motions for posttermination visitation. The court found that "neither [Valerie] nor [Anthony] . . . met their burden [of] prov[ing] [that] posttermination visitation for such parent is necessary or appropriate to secure the welfare, protection, proper care and suitable support of [Annessa]." The court noted that Anthony and Annessa had a good visiting relationship but found that posttermination visitation with Valerie or Anthony was "not required for [Annessa's] well-being, welfare, protection, proper care or suitable support." Accordingly, the court denied both of the respondents' motions.

Thereafter, the respondents separately appealed to the Appellate Court. Valerie raised several unpreserved claims of error pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). Specifically, she claimed, among other things, that the trial court "(1) violated her right to a 'public civil trial at common law' by conducting proceedings over the Microsoft Teams platform, rather than in court and in person, in violation of article fifth, § 1, and article first, § 10, of the Connecticut constitution, [and] (2) violated her right to due process of law by precluding her from confronting witnesses in court and in person when it conducted proceedings over the Microsoft Teams platform . . . ."[3] (Footnote omitted.) *In re Annessa J.*, supra, 206 Conn. App. 575. Additionally, both respondents argued that the trial court applied an incorrect legal standard when it considered their motions for posttermination visitation with Annessa. Id., 575–76.

The Appellate Court rejected each of Valerie's constitutional claims. See id., 575. The court explained that Valerie failed to establish that a party possesses a fundamental right under the Connecticut constitution to an in-court, in person termination of parental rights trial,

rather than a trial conducted over a virtual platform, such as Microsoft Teams. Id., 585. Accordingly, the court concluded that Valerie's state constitutional claim was not reviewable because it failed under the second prong of *Golding*. Id. The Appellate Court also concluded that, because Valerie did not ask the trial court to hold an evidentiary hearing on the need for a virtual trial, the record was inadequate to review Valerie's unpreserved federal due process claim. Id., 587. The Appellate Court, however, agreed with the respondents that the trial court had "failed to consider the appropriate standard under [General Statutes] § 46b-121 (b) (1) and *In re Ava W.* [336 Conn. 545, 589, 248 A.3d 675 (2020)], namely, whether posttermination visitation is '*necessary or appropriate* to secure the welfare, protection, proper care and suitable support of [the] child,' taking into account the traditional best interest analysis and the type of additional factors identified in *In re Ava W.*" (Emphasis in original.) *In re Annessa J.*, supra, 206 Conn. App. 603. Accordingly, the Appellate Court reversed the trial court's denial of the respondents' motions for posttermination visitation and affirmed the trial court's judgment terminating the respondents' parental rights. Id.

Thereafter, Valerie filed a petition for certification to appeal, which we granted, limited to the following issues: (1) "Did the Appellate Court, in affirming the judgment of the trial court terminating the parental rights of [Valerie] following a trial conducted via the Microsoft Teams platform over [Valerie's] objection, incorrectly determine that [Valerie's] unpreserved claim that article first, § 10, and article fifth, § 1, of the Connecticut constitution guaranteed her the right to an in person courtroom trial of the kind that existed at common law in 1818 was not of constitutional magnitude under the second prong of *State* v. *Golding*, [supra, 213 Conn. 233]?" And (2) "[d]id the Appellate Court, in affirming the trial court's judgment, incorrectly determine, under the first prong of *Golding*, that the record was inadequate to review [Valerie's] unpreserved claim that she was denied the right to physically confront the witnesses against her at the virtual trial on the petition to terminate her parental rights, in violation of the due process clause of the fourteenth amendment to the United States constitution?" *In re Annessa J.*, 338 Conn. 904, 904–905, 258 A.3d 674 (2021). The petitioner filed a petition for certification to cross appeal, which we granted, limited to the following issue: "Did the Appellate Court properly expand the standard set forth in *In re Ava W.*, [supra, 336 Conn. 545], for deciding motions for posttermination visitation beyond the question of whether, under . . . § 46b-121 (b) (1), such visitation is 'necessary or appropriate' to secure the welfare of the child?" *In re Annessa J.*, 338 Conn. 905, 258 A.3d 675 (2021). We address each of these three claims in turn. Additional facts and procedural history will be set

forth as necessary.

I

We begin with Valerie's unpreserved state and federal constitutional claims relating to the virtual nature of the termination of parental rights trial. The following additional facts and procedural history are relevant to our review of these claims. As we previously noted, due to the COVID-19 pandemic, the trial on the termination petition was held virtually, via Microsoft Teams. Before the presentation of evidence on the first day of trial, Anthony's counsel objected to the trial court's conducting the trial via Microsoft Teams instead of in person, and Valerie's counsel joined in the objection. The basis for the objection by Anthony's counsel was that "[t]he standard of proof is higher [in a termination of parental rights case], the inability for the court to see the parties and the witnesses . . . as would be [the case] in live trials—you know, the inability to see [whether] someone else is in the room giving answers, or [whether] a document is in front of the witness to help [the witness] testify." Anthony's counsel also noted that "the fact finder has to be able to assess . . . the witnesses, their demeanor, and, again, we're on little squares, and I'm having a hard time seeing what people are doing." Similarly, Valerie's counsel argued that "[i]t is very important that [the trial court] is able to, as a fact finder—able to look in the eyes of the person and, you know, make an assessment whether or not they are being truthful, and whether or not, what they are saying, they really mean it."

Annessa—who was fourteen years old at the time—argued, through her counsel, that the trial should proceed via Microsoft Teams. Annessa's counsel explained that "[Annessa] would like permanency. She's in support of the [termination of parental rights] and adoption, and we really don't know how long this pandemic will last." Similarly, the petitioner's counsel also argued that the trial could proceed and that the virtual nature of the proceeding would not disadvantage any of the parties. The petitioner's counsel also emphasized that "this case was supposed to be tried at the very beginning of March, [2020], and [Annessa] has been in limbo for over two years at this point and has been waiting for [the] trial for quite some time."

After a brief recess, the trial court denied the respondents' oral motion objecting to the virtual format of the trial. The court explained that, during the recess, it "talked to the chief administrative judge for juvenile [matters], and she confirmed that there is nothing precluding the court from going forward. And, in fact, the court has been directed by the chief court administrator's office to proceed, whenever possible, to go forward with matters that are necessary, important, and appropriate. I do believe that the matter can be conducted appropriately virtually. We do have the Connect-

icut Guide to Remote Hearings [for Attorneys and Self-Represented Parties] that was promulgated by the Judicial Branch.[4] I intend to follow it." (Footnote added.) The trial court also rejected the respondents' claim that the virtual format would interfere with its ability to properly weigh the evidence. Specifically, the court explained: "I think that there is sufficient eye contact with people. If—frankly, if they were in court, we might have less . . . visual contact because they'd have to have masks on. This way, hopefully, they don't have to have one on because they should be alone in a room. And I think that's important in terms of evaluating credibility. I feel confident that I will be able to make the appropriate findings. If, at some point, I'm concerned that that is not the case, I will raise it. And I always have the ability to do something in the future, during this trial, if I feel that it's gone awry or that I'm not able to perform my judicial duties, but, at this point, I'm comfortable that I can, given the parameters of where we are today. I think, given the pandemic, it's important that we do try to go forward in the best manner possible. I think this is the best manner possible."

After denying the respondents' motion, the trial court proceeded with the virtual trial. Over the course of trial, the court admitted nine full exhibits offered by Valerie, two by Anthony, and eighteen by the petitioner. The petitioner also presented the testimony of five witnesses, Valerie called three witnesses, Valerie testified on her own behalf, and Anthony called one witness. There were several technical issues throughout trial, such as background noise interrupting the audio of a witness and video "freezing" during an expert's testimony. In each instance, the trial court took corrective measures, including directing that a witness stop testifying until the background noise abated, directing an attorney to reposition her camera, and sending a new Microsoft Teams link when technical difficulties persisted. In keeping with its offer at the start of trial, the court also regularly paused the proceedings so that the parties could confer with their counsel. Additionally, at no time did the respondents ask for technical assistance or accommodations from the court. Relevant to Valerie's claims on appeal, in the trial court's memorandum of decision, the court noted that, "[d]ue to the COVID-19 . . . pandemic, the trial [on the termination of parental rights petition] was conducted virtually. The court made every reasonable effort to allow counsel and the parties to confer with each other during the proceedings and to address technical issues that arose from time to time. Using the virtual technology, the court was able to assess the demeanor and credibility of the witnesses."

## A

We turn first to Valerie's claim that the Appellate Court incorrectly determined that her "unpreserved

claim that article first, § 10, and article fifth, § 1, of the Connecticut constitution guaranteed her the [unqualified] right to an in person courtroom trial of the kind that existed at common law in 1818 was not of constitutional magnitude under the second prong of . . . *Golding* . . . ."[5] (Citation omitted.) The petitioner disagrees with Valerie and contends, among other things, that the Appellate Court correctly concluded that Valerie failed to establish that she had a fundamental right under article first, § 10, and article fifth, § 1, to an in person trial. We agree with the petitioner.

Although she objected to the virtual format of the trial, Valerie concedes that she did not raise this claim before the trial court and, therefore, seeks review under *State* v. *Golding*, supra, 213 Conn. 239–40. Pursuant to *Golding*, "a [respondent] can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the [respondent] of a fair trial; and (4) if subject to harmless error analysis, the [petitioner] has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original; footnote omitted.) Id.; see *In re Yasiel R.*, supra, 317 Conn. 781 (modifying third prong of *Golding*). "The first two steps in the *Golding* analysis address the reviewability of the claim, [whereas] the last two steps involve the merits of the claim." (Internal quotation marks omitted.) *In re Azareon Y.*, 309 Conn. 626, 634–35, 72 A.3d 1074 (2013).

In support of her claim, Valerie relies on article first, § 10, and article fifth, § 1, of the Connecticut constitution. Article first, § 10, provides: "All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay." Article fifth, § 1, provides: "The judicial power of the state shall be vested in a supreme court, a superior court, and such lower courts as the general assembly shall, from time to time, ordain and establish. The powers and jurisdiction of these courts shall be defined by law." The text of these constitutional provisions says nothing about whether trials must be conducted in person. Our courts have never had occasion to interpret either provision as imposing such a requirement. Nevertheless, Valerie contends that "article first, § 10, creates a right of the citizenry to a public civil trial of the kind that existed at common law in 1818," and "article fifth, § 1, creates a duty on the part of the Superior Court to find facts by observing firsthand the parties and witnesses in physical proximity to each other . . . ." Valerie, however, does not cite any authority or provide any historical analysis that

supports the proposition that these constitutional provisions require an in person trial for the termination of parental rights.

With respect to article first, § 10, we note that Valerie's counsel conceded at oral argument before the Appellate Court that "a public trial is not constitutionally required in juvenile matters . . . ." *In re Annessa J.*, supra, 206 Conn. App. 586. With this concession, Valerie is left to argue that the "open courts" provision of article first, § 10, was intended to enshrine the right to appear physically and in person for trial, yet she provides no authority in support of that claim.[6] We find no suggestion in our prior cases or historical sources indicating that the provision has anything to do with a right of physical appearance. Instead, the rights preserved by that provision are a litigant's common-law rights to obtain redress "for an injury done to him in his person, property or reputation . . . ." Conn. Const., art. I, § 10; see, e.g., *Kelley Property Development, Inc.* v. *Lebanon*, 226 Conn. 314, 331, 627 A.2d 909 (1993) ("we have consistently interpreted article first, § 10, to prohibit the legislature from abolishing a right that existed at common law prior to 1818"); *Gentile* v. *Altermatt*, 169 Conn. 267, 286, 363 A.2d 1 (1975) ("[s]imply stated, all rights derived by statute and the common law extant at the time of the adoption of article first, § 10, are incorporated in that provision by virtue of being established by law as rights the breach of which precipitates a recognized injury, thus being exalted beyond the status of common-law or statutory rights of the type created subsequent to the adoption of that provision"), appeal dismissed, 423 U.S. 1041, 96 S. Ct. 763, 46 L. Ed. 2d 631 (1976). The provision also guarantees that any such remedy be provided "by due course of law, and right and justice administered without sale, denial or delay." Conn. Const., art. I, § 10. That language has been construed "as prohibiting the state from selling justice by imposing unreasonable charges on the litigants in the courts . . . and as ending the practice by a corrupt judiciary of demanding gratuities for giving or withholding decisions in pending cases." (Citation omitted.) *Doe* v. *State*, 216 Conn. 85, 97, 579 A.2d 37 (1990). Valerie points to no authority in which this court has interpreted article first, § 10, as imposing any requirements on how courts adjudicate cases, such as requiring that courts conduct trials in person, and we decline to do so.

The cases that Valerie relies on to support her claim with respect to article fifth, § 1, address the separation of powers among the three branches of government and stand for the proposition that it is the duty of the trial court—not an appellate court—to find facts.[7] See *Styles* v. *Tyler*, 64 Conn. 432, 449–50, 30 A. 165 (1894) ("The whole judicial power of the [s]tate is vested in the courts . . . . The 'Supreme Court of Errors' is not a supreme court for all purposes, but a supreme court

only for the correction of errors in law . . . .”); see also *Nolan* v. *New York, New Haven & Hartford Rail-road Co.*, 70 Conn. 159, 173–77, 39 A. 115 (1898) (discussing distinction between questions of fact and questions of law). Far from mandating the form a trial must take, *Styles* focused on explaining that “the evil which the people sought to prevent by article [fifth] of our [c]onstitution” was judicial power residing in the General Assembly. *Styles* v. *Tyler*, supra, 449. Case law generally references article fifth, § 1, for the proposition that the legislature is responsible for establishing certain lower courts and defining their jurisdiction. See, e.g., *Adams* v. *Rubinow*, 157 Conn. 150, 155–56, 251 A.2d 49 (1968); see also, e.g., *State* v. *Gomes*, 337 Conn. 826, 842–43, 256 A.3d 131 (2021). None of the cases Valerie relies on stands for the proposition that a termination of parental rights trial must be conducted in person.

Finally, we note that Valerie does not address the impact of this court’s holding in *In re Juvenile Appeal (Docket No. 10155)*, 187 Conn. 431, 446 A.2d 808 (1982), on her claim. In *In re Juvenile Appeal (Docket No. 10155)*, this court held that, as applied to the facts of that case, the trial court did not violate the respondent father’s constitutional rights by conducting a termination of parental rights trial while the respondent participated via telephone instead of in the physical presence of the judge deciding the case. See id., 435–41. We explained that “[w]e cannot . . . say that the lack of a visual image seriously disadvantaged the trial court in making its determination. . . . [L]imiting the opportunity to assess the respondent’s demeanor to its auditory component seems to us to entail only the most marginal risk that the [trial court] would be misled in evaluating the respondent’s credibility.” Id., 438.

In light of the foregoing, we agree with the Appellate Court that Valerie failed to establish that there exists a fundamental right under article first, § 10, and article fifth, § 1, of the Connecticut constitution to an in person termination of parental rights trial.[8] Accordingly, we conclude that Valerie’s claim fails under the second prong of *Golding*.

B

We turn next to Valerie’s claim that the Appellate Court incorrectly determined that “the record was inadequate to review [her] unpreserved claim that she was denied the right to physically confront the witnesses against her at the virtual trial on the petition to terminate her parental rights, in violation of the due process clause of the fourteenth amendment to the United States constitution.” The petitioner contends, among other things, that the Appellate Court correctly concluded that the record was inadequate to review this unpreserved claim. We agree with the petitioner.

Valerie again concedes that she did not raise this claim before the trial court and, therefore, seeks review under *State* v. *Golding*, supra, 213 Conn. 239–40. See part I A of this opinion. Unlike her state constitutional claim, which did not require any factual predicates because she claimed an unqualified right to an in person trial, Valerie's federal constitutional claim is not based on an alleged unqualified right to confront the petitioner's witnesses in person under the fourteenth amendment to the United States constitution. Rather, Valerie claims that she had the right to do so "in the absence of evidence demonstrating the existence of a compelling governmental interest sufficient to curtail the right." Valerie thus acknowledges that there are certain countervailing governmental interests that may be sufficient to justify curtailing any constitutional right to in person confrontation. Indeed, to address the merits of Valerie's claim, this court would apply the three part test set forth in *Mathews* v. *Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). The third part of that test requires us to consider the governmental interests at stake. Id. In the present case, the trial court explained that, "[d]ue to the COVID-19 . . . pandemic, the trial [on the termination of parental rights petition] was conducted virtually." As a result, we would need to consider the specific factual circumstances surrounding the trial and the COVID-19 pandemic to properly evaluate Valerie's claim. As Valerie concedes, "[a]lthough the trial court referenced the COVID-19 public emergency as the reason for conducting the trial virtually, there was no actual evidence before the court that [SARS-CoV-2, the virus that causes COVID-19], threatened the health or safety of any of the persons involved in this particular case." It is for this reason that the record is inadequate to review Valerie's unpreserved federal due process claim. Even if this court were to assume that Valerie had a right to in person confrontation in the absence of compelling countervailing interests, this court has no factual record or factual findings on which to base a determination of whether that right was violated or whether the trial court correctly concluded that the government's interests were sufficiently great to warrant conducting the trial virtually. See, e.g., *In re Azareon Y.*, supra, 309 Conn. 637 (reviewing court was unable to determine whether trial court deprived respondent mother of her alleged right to less restrictive permanency plan in absence of factual record demonstrating that less restrictive permanency plan existed).

Valerie nevertheless argues that the lack of evidence in the record regarding "whether there was a compelling reason to curtail her right [to] physical confrontation was not her burden to overcome under the first prong of . . . *Golding*." We disagree.

During the trial, the petitioner and the trial court were never put on notice that Valerie objected to the

virtual nature of the termination of parental rights trial on the basis that it violated her right to confront the petitioner's witnesses. Rather, the respondents objected to the trial being conducted virtually on the basis that doing so would interfere with their ability to present evidence and the trial court's ability to weigh that evidence. Because the trial court was not alerted to this right to confrontation issue, it did not have occasion to make findings of fact regarding the threat posed by the COVID-19 pandemic and whether that threat was sufficiently compelling to curtail any constitutional right to in person confrontation. "In such circumstances, the [petitioner] bears no responsibility for the evidentiary lacunae, and, therefore, it would be manifestly unfair to the [petitioner] for this court to reach the merits of the [respondent's] claim upon a mere assumption that [the factual predicate to her claim has been met]." (Emphasis omitted.) *State* v. *Brunetti*, 279 Conn. 39, 59, 901 A.2d 1 (2006), cert. denied, 549 U.S. 1212, 127 S. Ct. 1328, 167 L. Ed. 2d 85 (2007).

Not only would such an assumption be improper, but, because, "under the test in *Golding*, we must determine whether the [appellant] can prevail on his [or her] claim, a remand to the trial court would be inappropriate. The first prong of *Golding* was designed to avoid remands for the purpose of supplementing the record." (Emphasis omitted.) *State* v. *Stanley*, 223 Conn. 674, 689–90, 613 A.2d 788 (1992). The parties agree that there is an inadequate basis in the record for the trial court to determine whether the government's interests warrant conducting a virtual trial. Thus, in order to make the requisite findings, the trial court, on remand, would have to open the evidence. "In cases of unpreserved constitutional claims, this court consistently has refused to order a new trial when it would be necessary to elicit additional evidence to determine whether the constitutional violation exists." *In re Azareon Y.*, supra, 309 Conn. 639, citing *State* v. *Dalzell*, 282 Conn. 709, 721–22, 924 A.2d 809 (2007) (overruled in part on other grounds by *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 84 A.3d 840 (2014)), *State* v. *Canales*, 281 Conn. 572, 582, 916 A.2d 767 (2007), *State* v. *Brunetti*, supra, 279 Conn. 59, 64, *State* v. *Daniels*, 248 Conn. 64, 80, 726 A.2d 520 (1999) (overruled in part on other grounds by *State* v. *Singleton*, 274 Conn. 426, 876 A.2d 1 (2005)), and *State* v. *Medina*, 228 Conn. 281, 301–302, 636 A.2d 351 (1994). Therefore, we agree with the Appellate Court that the record is inadequate for review of this claim.

II

We turn next to the petitioner's claim, raised on cross appeal, that the Appellate Court improperly expanded the standard set forth in *In re Ava W.*, supra, 336 Conn. 588–90, for deciding motions for posttermination visita-

tion and improperly reversed the trial court's rulings on the respondents' motions for failing to comply with that standard. The respondents disagree with the petitioner and contend that the Appellate Court correctly concluded that the trial court had improperly applied a more exacting standard to their motions for posttermination visitation than was required. We agree with the petitioner.

The record and the Appellate Court's opinion set forth the following additional facts and procedural history relevant to our review of this claim. See *In re Annessa J.*, supra, 206 Conn. App. 598–600. During the termination of parental rights trial, the respondents timely filed motions for posttermination visitation with Annessa, citing this court's decision in *In re Ava W.* In ruling on the respondents' motions, the trial court concluded in relevant part that "neither [Valerie] nor [Anthony] . . . met their burden [of] prov[ing] [that] posttermination visitation for such parent is necessary or appropriate to secure the welfare, protection, proper care and suitable support of [Annessa]. [Valerie] avers that it is in the best interest of Annessa for visitation to continue. That is not the standard under . . . § 46b-121 (b) (1). . . . Posttermination visitation by [Valerie] with Annessa is not required for [Annessa's] well-being, welfare, protection, proper care or suitable support. [Valerie's] motion is denied. . . . [Anthony] likewise avers [that] it is in the best interest of Annessa for visitation to continue. [Anthony] and Annessa do have a good visiting relationship. However, that does not equate to a finding that posttermination [visitation] is required for Annessa. . . . Posttermination visitation by [Anthony] with Annessa is not required for her well-being, welfare, protection, proper care or suitable support. [Anthony's] motion is denied."

Thereafter, the respondents appealed to the Appellate Court, claiming that the trial court employed an incorrect legal standard in ruling on their motions for posttermination visitation. *In re Annessa J.*, supra, 206 Conn. App. 598. The Appellate Court agreed, concluding that the trial court had failed to consider the appropriate standard, as set forth in *In re Ava W.* Id., 603. The Appellate Court reasoned that our decision in *In re Ava W.* did not purport to reject the "best interest of the child" standard but, instead, held that, "when [a trial court rules on] a motion for posttermination visitation during a termination of parental rights case, the . . . court's consideration of the traditional best interest of the child is only part of the consideration of whether such visitation is 'necessary or appropriate to secure the welfare, protection, proper care and suitable support of [the] child.' " Id., 601. Consistent with this conclusion, the Appellate Court determined that the trial court applied an incorrect legal standard in ruling on the respondents' motions for posttermination visitation because it (1) "improperly required [the respondents]

to establish that posttermination visitation was required for Annessa's well-being"; (emphasis omitted) id., 602; and (2) failed to consider "whether posttermination visitation is 'necessary or appropriate to secure the welfare, protection, proper care and suitable support of [the] child,' taking into account *the traditional best interest analysis* and the type of additional factors identified in *In re Ava W.*" (Emphasis altered.) Id., 603. Accordingly, the Appellate Court reversed the trial court's denial of the motions for posttermination visitation and remanded the case for further proceedings on the respondents' motions. Id.

On cross appeal to this court, the petitioner argues that the Appellate Court improperly reversed the trial court's denial of the respondents' motions on the ground that the respondents had failed to prove that an order of posttermination visitation was "necessary or appropriate" to secure Annessa's welfare. Specifically, the petitioner contends that the Appellate Court improperly expanded the *In re Ava W.* standard by concluding that trial courts " 'should take a broader view of best interest' " in ruling on motions for posttermination visitation, "rather than adhering to the language set forth [in] § 46b-121 (b) (1)." The petitioner further argues that the Appellate Court incorrectly concluded that the trial court held the respondents to a more exacting standard than the "necessary or appropriate" standard insofar as the trial court had found that an order of posttermination visitation was "not required" after first finding that such an order was not "necessary or appropriate" for Annessa's welfare. According to the petitioner, the trial court applied the proper legal standard, and she, therefore, asks this court to reverse the judgment of the Appellate Court on this issue.

The respondents disagree with the petitioner, although they have differing interpretations of the Appellate Court's opinion.[9] Valerie argues that the Appellate Court properly expanded the standard set forth in *In re Ava W.*, as it recognized that the "best interest of the child" standard is incorporated into a trial court's overall consideration of whether posttermination visitation is "necessary or appropriate" for the child's welfare. By contrast, Anthony argues that the Appellate Court did not purport to broaden the "necessary or appropriate" standard but, instead, correctly understood that, pursuant to *In re Ava W.*, the standard was already broad and inclusive. Notwithstanding these differing interpretations, both of the respondents claim that the Appellate Court correctly concluded that the trial court had applied an unduly narrow legal standard in ruling on their motions for posttermination visitation.

We begin our analysis with the relevant standard of review and legal principles. The petitioner challenges the Appellate Court's application of the legal standard

for deciding motions for posttermination visitation, and, therefore, her claim raises an issue of law over which we exercise plenary review. See, e.g., *Fish* v. *Fish*, 285 Conn. 24, 37, 939 A.2d 1040 (2008) ("[t]he . . . determination of the proper legal standard in any given case is a question of law subject to our plenary review").

Our recent decision in *In re Ava W.* squarely governs our analysis in the present case. In *In re Ava W.*, we held, for the first time, that a trial court has the authority to consider a motion for posttermination visitation when the court considers termination of parental rights pursuant to § 17a-112 (j).[10] *In re Ava W.*, supra, 336 Conn. 548–49, 577. This authority, we explained, originates from the trial court's broad authority in juvenile matters, codified at § 46b-121 (b) (1), "to make and enforce such orders . . . necessary or appropriate to secure the welfare, protection, proper care and suitable support of a child," including orders impacting parental rights, such as termination and visitation. See *In re Ava W.*, supra, 572–76.

Having determined that trial courts possess such authority, we next considered the legal standard and potential factors for trial courts to consider when evaluating motions for posttermination visitation. See id., 588–90. Ultimately, we "derive[d] the standard for evaluating posttermination visitation from the authority granted to trial courts under § 46b-121 (b) (1)"; id., 588–89; and concluded that "the mo[st] prudent approach when evaluating whether posttermination visitation should be ordered is to adhere to the standard that the legislature expressly adopted [in § 46b-121 (b) (1)]— 'necessary or appropriate to secure the welfare, protection, proper care and suitable support of [the] child . . . .' " Id., 589, quoting General Statutes § 46b-121 (b) (1). In adopting the "necessary or appropriate" standard, we considered and explicitly rejected the respondent mother's argument that trial courts should employ the "best interest of the child" standard when ruling on motions for posttermination visitation. See *In re Ava W.*, supra, 336 Conn. 589. Specifically, we wrote: "Although the respondent . . . [mother] contends that any posttermination visitation should be evaluated on the basis of the child's best interest, we conclude that the mo[st] prudent approach . . . is to adhere to the standard that the legislature expressly adopted [in § 46b-121 (b) (1)] . . . ." Id. We went on to explain that whether to order posttermination visitation is a question of fact for the trial court, and trial courts should consider various factors when evaluating whether to order posttermination visitation. Id. These factors may include, but are not limited to, "the child's wishes, the birth parent's expressed interest, the frequency and quality of visitation between the child and birth parent prior to the termination of the parent's parental rights, the strength of the emotional bond between the child and the birth parent, any interference

with present custodial arrangements, and any impact on the adoption prospects for the child." Id., 590.

Despite our rejection of the "best interest of the child" standard and adoption of the "necessary or appropriate" standard in *In re Ava W.*, in the present case, the Appellate Court held—and Valerie argues—that our decision in *In re Ava W.* did *not* unequivocally reject the "best interest of the child" standard. Instead, the Appellate Court interpreted *In re Ava W.* to hold that, "when [a trial court rules on] a motion for posttermination visitation . . . the . . . court's consideration of the traditional best interest of the child is only part of the consideration of whether such visitation is 'necessary or appropriate to secure the welfare, protection, proper care and suitable support of [the] child.' " *In re Annessa J.*, supra, 206 Conn. App. 601, quoting *In re Ava W.*, supra, 336 Conn. 589. To support its reasoning, the Appellate Court noted that, in *In re Ava W.*, before setting forth factors that trial courts can consider in ruling on a motion for posttermination visitation, we stated: "Whether to order posttermination visitation is . . . a question of fact for the trial court, which has the parties before it and is in the best position to analyze all of the factors which go into the ultimate conclusion that [posttermination visitation is *in the best interest of the child*]." (Emphasis added; internal quotation marks omitted.) *In re Ava W.*, supra, 589; see *In re Annessa J.*, supra, 601. The Appellate Court maintained that our use of the phrase "best interest of the child" in that portion of the decision indicates that a trial court "should take a broader view of best interest [than the analysis made during the dispositional phase of the termination of parental rights hearing], including consideration of the factors set forth in *In re Ava W.*, to determine whether posttermination visitation is 'necessary or appropriate to secure the welfare, protection, proper care and suitable support of [the] child.' " *In re Annessa J.*, supra, 602, quoting *In re Ava W.*, supra, 589.

We did not, however, intend this sentence, in isolation, to broaden the applicable standard to include a "best interest of the child" analysis. See, e.g., *Fisher* v. *Big Y Foods, Inc.*, 298 Conn. 414, 424–25, 3 A.3d 919 (2010) ("an opinion must be read as a whole, without particular portions read in isolation, to discern the parameters of its holding").[11] Rather, read in its entirety, our decision in *In re Ava W.* held that trial courts must adhere to the "necessary or appropriate" standard set forth in § 46b-121 (b) (1), not the "best interest of the child" standard, when ruling on motions for posttermination visitation. See *In re Ava W.*, supra, 336 Conn. 589.[12]

Valerie nevertheless argues that the standard set forth in § 46b-121 (b) (1) necessarily incorporates the "best interest of the child" standard because it "codifies the . . . Superior Court's common-law powers to [issue]

any order necessary or appropriate to secure the 'welfare' of a minor child committed to the court's jurisdiction." Valerie contends that, because the legislature enacted § 46b-121 (b) (1) "against the backdrop of . . . common-law history equating the child's welfare with the child's best interests," this court must presume that the legislature intended to incorporate the "best interest of the child" standard into § 46b-121 (b) (1) by its use of the word "welfare" in that statute. We disagree.

The legislature has frequently used the terms "best interest of the child," "best interests of the child," and "child's best interests" throughout chapter 815t of the General Statutes. See, e.g., General Statutes §§ 46b-129, 46b-129a, 46b-129c, 46b-132a and 46b-149. Typically, "[w]hen a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject . . . is significant to show that a different intention existed. . . . That tenet of statutory construction is well grounded because [t]he General Assembly is always presumed to know all the existing statutes and the effect that its action or [nonaction] will have [on] any one of them." (Internal quotation marks omitted.) *State* v. *Heredia*, 310 Conn. 742, 761, 81 A.3d 1163 (2013); see, e.g., *Felician Sisters of St. Francis of Connecticut, Inc.* v. *Historic District Commission*, 284 Conn. 838, 850, 937 A.2d 39 (2008) ("[t]he use of the different terms . . . within the same statute suggests that the legislature acted with complete awareness of their different meanings . . . and that it intended the terms to have different meanings" (internal quotation marks omitted)). Thus, we presume that, had the legislature intended to incorporate the "best interest of the child" standard into the "necessary or appropriate" standard set forth in § 46b-121 (b) (1), it would have used the words "best interest of the child" instead of, or in addition to, "welfare." See, e.g., *State* v. *Kevalis*, 313 Conn. 590, 604, 99 A.3d 196 (2014) ("it is a well settled principle of statutory construction that the legislature knows how to convey its intent expressly" (internal quotation marks omitted)); *McCoy* v. *Commissioner of Public Safety*, 300 Conn. 144, 155, 12 A.3d 948 (2011) ("[o]ur case law is clear . . . that when the legislature chooses to act, it is presumed to know how to draft legislation consistent with its intent and to know of all other existing statutes and the effect that its action or nonaction will have [on] any one of them" (internal quotation marks omitted)). We decline to import a standard into § 46b-121 (b) (1) that the legislature chose not to employ.

Anthony concedes that the Appellate Court "may have erred when it stated that this court [in *In re Ava W.*] did not explicitly reject the best interest standard" but nevertheless argues that the distinction that we drew in *In re Ava W.* between "necessary or appropriate" and "best interest of the child" was not substantive. To the extent that Anthony contends that whether

a trial court utilizes the "best interest of the child standard" or the "necessary or appropriate" standard is purely a matter of semantics, we disagree. This contention is belied by our decision in *In re Ava W.*, in which, after considering both standards, we explicitly rejected the "best interest of the child" standard in favor of the "necessary or appropriate" standard. (Internal quotation marks omitted.) *In re Ava W.*, supra, 336 Conn. 588–89. Moreover, our legislature has used the "best interest of the child" standard in other related statutes, and, thus, we presume that it intended to use a different standard when it employed the "necessary or appropriate" standard in § 46b-121 (b) (1). Cf. *Lopa* v. *Brinker International, Inc.*, 296 Conn. 426, 433, 994 A.2d 1265 (2010) ("[T]he legislature [does] not intend to enact meaningless provisions. . . . [I]n construing statutes, we presume that there is a purpose behind every sentence, clause, or phrase used in an act and that no part of a statute is superfluous. . . . Because [e]very word and phrase [of a statute] is presumed to have meaning . . . [a statute] must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant." (Internal quotation marks omitted.)).

Moreover, we conclude that the "necessary or appropriate" standard is more stringent than the "best interest of the child" standard. Cf. *In re Alissa N.*, 56 Conn. App. 203, 208, 742 A.2d 415 (1999) ("Conducting a best interest analysis *is not a narrow concept* restricted to a compelling reason [for keeping a parent in a child's life] or to fully reuniting the parent with the child. Rather, it is *purposefully broad* to enable the trial court to exercise its discretion based [on] a host of considerations." (Emphasis added; internal quotation marks omitted.)), cert. denied, 252 Conn. 932, 746 A.2d 791 (2000). The term "necessary," when used in this context, has one fixed meaning: "Impossible to be otherwise . . . indispensable; requisite; [or] essential." Webster's New International Dictionary (1931) p. 1443. Although the definition of "appropriate" is elastic insofar as it is susceptible to a number of meanings; see, e.g., id., p. 111 (defining "appropriate" as "[b]elonging peculiarly," "suitable," "fit," or "proper"); given the fact that the preceding word in the standard is "necessary," we choose to adopt a definition of "appropriate" that aligns with the more exacting term, "necessary." In the context of posttermination visitation, we read the word "appropriate" to mean "proper."

To define "appropriate" broadly would be to negate the word "necessary" within the standard set forth in § 46b-121 (b) (1). It is well settled that "[i]nterpreting a statute to render some of its language superfluous violates cardinal principles of statutory interpretation." *American Promotional Events, Inc.* v. *Blumenthal*, 285 Conn. 192, 203, 937 A.2d 1184 (2008). Furthermore, as Justice Keller notes in her concurrence, "there should

be few cases in which court-ordered posttermination visitation could be deemed 'necessary or appropriate to secure the [child's] welfare,' " particularly in light of the grounds on which a trial court can terminate parental rights. See General Statutes § 17a-112 (j). A more exacting standard is required in this context, particularly in light of the rare circumstance in which a trial court could simultaneously terminate parental rights and, in the same proceeding, order posttermination visitation. Mindful of these considerations, we conclude that the "necessary or appropriate" standard is purposefully more stringent than the "best interest of the child" standard, as the trial court must find that posttermination visitation is necessary or appropriate—meaning "proper"—to secure the child's welfare.

Accordingly, we conclude that the Appellate Court improperly expanded the standard set forth in *In re Ava W.* As we held in *In re Ava W.*, the proper standard for deciding motions for posttermination visitation is the "necessary or appropriate" standard adopted by the legislature in § 46b-121 (b) (1). See *In re Ava W.*, supra, 336 Conn. 588–89.

Having concluded that the Appellate Court improperly expanded the standard for deciding motions for posttermination visitation set forth in *In re Ava W.*, we next must determine whether the Appellate Court nevertheless correctly concluded that the trial court held the respondents to a more stringent standard than the "necessary or appropriate" standard that we articulated in *In re Ava W.*

In its memorandum of decision, the trial court found that "neither [Valerie] nor [Anthony] . . . met their burden [of] prov[ing] [that] posttermination visitation for such parent is *necessary or appropriate* to secure the welfare, protection, proper care and suitable support of [Annessa]." (Emphasis added.) In so ruling, the trial court recited the proper "necessary or appropriate" standard. (Internal quotation marks omitted.) *In re Ava W.*, supra, 336 Conn. 589. It also correctly recognized that the respondents' contention—that it would be in Annessa's best interest for posttermination visitation to continue—was "not the standard under . . . § 46b-121 (b) (1)." In addition, the trial court also explicitly considered at least one of the factors we enumerated in *In re Ava W.* that a trial court may consider when determining whether posttermination visitation is "necessary or appropriate" for the child's well-being. Specifically, in denying Anthony's motion for posttermination visitation, the trial court noted that "[Anthony] and Annessa do have a good visiting relationship." See *In re Ava W.*, supra, 590 (noting that one factor trial courts may consider when ruling on party's motion for posttermination visitation is "the frequency and quality of visitation between the child and birth parent prior to the termination of the parent's parental rights").

When the trial court's memorandum of decision is read as a whole, the court's specific references to the standard set forth in *In re Ava W.*, made throughout the relevant portion of the court's memorandum, and its explicit consideration of at least one factor from *In re Ava W.*, indicate that the trial court applied the correct legal standard in ruling on the respondents' motions for posttermination visitation. See, e.g., *In re Jason R.*, 306 Conn. 438, 453, 51 A.3d 334 (2012) ("[A]n opinion must be read as a whole, without particular portions read in isolation, to discern the parameters of its holding. . . . Furthermore, [w]e read an ambiguous trial court record so as to support, rather than contradict, its judgment." (Citation omitted; internal quotation marks omitted.)). Indeed, in the absence of some clear indication to the contrary, we presume that the trial court applied the correct legal standard. See, e.g., *DiBella* v. *Widlitz*, 207 Conn. 194, 203–204, 541 A.2d 91 (1988) ("[in the absence of] a record that demonstrates that the trial court's reasoning was in error, we presume that the trial court correctly analyzed the law and the facts in rendering its judgment"); *State* v. *Baker*, 50 Conn. App. 268, 275 n.5, 718 A.2d 450 ("the trial court's ruling is entitled to the reasonable presumption that it is correct unless the party challenging the ruling has satisfied its burden [of] demonstrating the contrary" (internal quotation marks omitted)), cert. denied, 247 Conn. 937, 722 A.2d 1216 (1998).

The respondents argue that the trial court's statement that posttermination visitation with the respondents was "not required" for Annessa's well-being demonstrates that the trial court was holding them to a more stringent standard than is required by *In re Ava W.* We disagree.

We conclude that the trial court's finding that posttermination visitation with the respondents was "not required" merely reiterated its earlier conclusion that such visitation was not "necessary," part and parcel of the standard set forth in *In re Ava W.*, which requires trial courts to consider whether posttermination visitation is "*necessary* or appropriate" for the child's well-being. (Emphasis added; internal quotation marks omitted.) *In re Ava W.*, supra, 336 Conn. 589. Indeed, the terms "necessary" and "required" are synonymous. See, e.g., Merriam-Webster's Collegiate Dictionary (11th Ed. 2014) p. 828 (defining "necessary" as "absolutely needed" and identifying "*required*" as synonymous term (emphasis added)). As we have previously noted, "this court has never required the talismanic recital of specific words or phrases if a review of the entire record supports the conclusion that the trial court properly applied the law." *State* v. *Henderson*, 312 Conn. 585, 597, 94 A.3d 614 (2014); see, e.g., *State* v. *Reid*, 22 Conn. App. 321, 326–27, 577 A.2d 1073 (determining that trial court's charge to jury was not defective, despite fact that court

substituted word "adverse" for "unfavorable" in statute, "because the terms are synonymous and such a substitution does not change the meaning of the sentence"), cert. denied, 216 Conn. 828, 582 A.2d 207 (1990).

Given that the trial court correctly articulated the "necessary *or* appropriate" standard; (emphasis added; internal quotation marks omitted) *In re Ava W.*, supra, 336 Conn. 589; see *State* v. *Dennis*, 150 Conn. 245, 248, 188 A.2d 65 (1963) ("[t]he use of the disjunctive 'or' between the two parts of the statute indicates a clear legislative intent of separability"); and stated that posttermination visitation was "not required" only *after* it determined that the respondents had not satisfied their burden of proving that such visitation was "necessary or appropriate" to secure Annessa's welfare, we are persuaded that the trial court understood that it was required to determine whether posttermination visitation was either necessary (i.e., required) *or* appropriate. Cf. *Hartford* v. *CBV Parking Hartford, LLC*, 330 Conn. 200, 214–15, 192 A.3d 406 (2018) (rejecting city's argument that trial court failed to consider critical element when reaching its decision because trial court did not recite relevant "talismanic phrase," and concluding that trial court applied proper legal standard because it repeatedly cited to decision of this court, which unambiguously set forth legal standard, and implicitly acknowledged that element in its analysis). We therefore conclude that the Appellate Court incorrectly determined that the trial court held the respondents to a more exacting legal standard than the one set forth in *In re Ava W.*

The judgment of the Appellate Court is reversed insofar as that court reversed the trial court's rulings on the respondents' motions for posttermination visitation, the judgment of the Appellate Court is affirmed insofar as that court upheld the trial court's termination of the respondents' parental rights, and the case is remanded to the Appellate Court with direction to affirm the judgment terminating the respondents' parental rights and to affirm the trial court's denial of the respondents' motions.

In this opinion ROBINSON, C. J., and D'AURIA and MULLINS, Js., concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Moreover, in accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018), as amended by the Violence Against Women Act Reauthorization Act of 2022, Pub. L. No. 117-103, § 106, 136 Stat. 49; we decline to identify any person protected or sought to be protected under a protection order, protective order, or a restraining order that was issued or applied for, or others through whom that person's identity may be ascertained.

Furthermore, in accordance with our policies of protecting the privacy interests of victims of family violence or sexual assault, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

** June 20, 2022, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] Microsoft Teams is "collaborative meeting [computer software] with video, audio, and screen sharing features." Connecticut Judicial Branch, Connecticut Guide to Remote Hearings for Attorneys and Self-Represented Parties (November 23, 2021) p. 5, available at https://jud.ct.gov/HomePDFs/ ConnecticutGuideRemoteHearings.pdf (last visited June 15, 2022).

[2] The attorney for the minor child, Annessa, adopted the petitioner's brief and all of her legal arguments.

[3] On appeal before the Appellate Court, Anthony did not take issue with the virtual format of the trial but, instead, raised claims relating to the merits of the trial court's termination judgment. The Appellate Court affirmed the trial court's judgment with respect to these claims. See *In re Annessa J.*, supra, 206 Conn. App. 590–98. Anthony did not file a petition for certification to appeal from the Appellate Court's judgment, and, as a result, those claims are not at issue in this appeal.

[4] Due to the COVID-19 pandemic, the Judicial Branch began holding virtual hearings using Microsoft Teams in 2020. The Judicial Branch created the Connecticut Guide to Remote Hearings for Attorneys and Self-Represented Parties to "assist anyone who is preparing to participate in a remote court hearing through Connecticut's 'Remote Justice Virtual Courtroom.' This includes counsel, self-represented parties, and other necessary hearing participants, such as witnesses." Connecticut Judicial Branch, Connecticut Guide to Remote Hearings for Attorneys and Self-Represented Parties (November 23, 2021) p. 4, available at https://jud.ct.gov/HomePDFs/ConnecticutGuideR emoteHearings.pdf (last visited June 15, 2022).

[5] Unlike her federal due process claim; see part I B of this opinion; Valerie's state constitutional claim is based on an alleged unqualified right to an in person trial. Specifically, she claims that the trial court violated her state constitutional rights by conducting a virtual trial, regardless of its reason for doing so. As a result, the record is adequate to review this claim because it does not require any factual predicates, and it is clear from the record that the trial was held virtually via Microsoft Teams. As we explain in part I B of this opinion, Valerie does not claim an unqualified right to physically confront the witnesses against her under the fourteenth amendment to the federal constitution.

[6] Valerie does not allege any procedural due process violation with regard to this claim.

[7] We recognize that "the ultimate decision [as to whether termination is justified] is intensely human. It is the judge in the courtroom who looks the witnesses in the eye, interprets their body language, listens to the inflections in their voices and otherwise assesses the subtleties that are not conveyed in the cold transcript." (Internal quotation marks omitted.) *In re Nevaeh W.*, 317 Conn. 723, 740, 120 A.3d 1177 (2015). Valerie, however, does not explain how the virtual format of the trial prevents a trial judge from finding facts and making credibility assessments.

[8] Other state appellate courts have concluded that trial courts may conduct termination of parental rights trials virtually or by telephone, as long as the court ensures that the technology functions properly and the parent can meaningfully participate. See, e.g., *People ex rel. R.J.B.*, 482 P.3d 519, 524–25 (Colo. App. 2021), cert. denied, Colorado Supreme Court, Docket No. 21SC115 (March 15, 2021); *In re T.J.*, Docket No. 1-21-0740, 2021 WL 4941511, *7–9 (Ill. App. October 21, 2021); *In re M.M.*, Docket No. 21A-JT-840, 2021 WL 4839067, *3–4 (Ind. App. October 18, 2021) (decision without published opinion, 176 N.E.3d 589); *In re A.H.*, 950 N.W.2d 27, 36 (Iowa App. 2020); *In re TJH*, 485 P.3d 408, 413–16 (Wyo. 2021).

[9] Anthony argues that the Appellate Court based its reversal solely on the trial court's purportedly erroneous application of a "required" standard, *not* on whether the trial court erroneously rejected the best interest of the child standard. We disagree.

In reversing the trial court's denial of the respondents' motions for posttermination visitation, the Appellate Court specifically took issue with the trial court's use of the "not required" language, as well as its explicit rejection of the "best interest of the child" standard. See *In re Annessa J.*, supra, 206 Conn. App. 602–603 (noting that "the [trial] court went on to explain that the best interest standard was 'not the standard under . . . § 46b-121 (b) (1)' *and* that posttermination visitation was 'not required for the child's well-being, welfare, protection, proper care or suitable support,' " and concluding that, "[o]n the basis of *these statements* by the court, we are persuaded that the court failed to consider the appropriate standard" (emphasis altered)).

[10] In a case that was argued on the same day as the present case, this court was asked to address whether, posttermination, biological parents have "a legally cognizable interest to support a right to intervene in [a] juvenile case for the purpose of seeking visitation." *In re Riley B.*, 342 Conn. 333, 336, 269 A.3d 776 (2022).

[11] We acknowledge that, given our inclusion of the words "the best interest of the child" in *In re Ava W.*, the Appellate Court's interpretation was not without a logical basis. Any confusion that emanated from our unfortunate, but isolated, use of that phrase in *In re Ava W.* is hopefully cleared up by our legal analysis in this case.

[12] We pause briefly to provide one point of clarification. When a trial court analyzes the relevant factors to determine whether posttermination visitation is "necessary or appropriate" for the child's welfare, it makes its determination pursuant to its authority, codified at § 46b-121 (b) (1), to act in the child's best interest. See, e.g., *In re Ava W.*, supra, 336 Conn. 570–72 (citing historical cases demonstrating that, at common law, "courts had *broad authority* to act in the child's best interest in juvenile matters," and § 46b-121 (b) (1) codified that authority (emphasis added)). Our recognition that trial courts retain this broad authority does not indicate that courts should utilize a broad *standard* when ruling on motions for posttermination visitation. Indeed, the trial court's *authority* to issue orders for posttermination visitation is distinct from the *standard* that it applies in exercising that authority. As we explain in greater detail in this opinion, the standard we chose to adopt in *In re Ava W.* is that which the legislature expressly adopted in § 46b-121 (b) (1).